FILED

2010 Dec-21 AM 11:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION



|  |  |  |
|---|---|---|
| NELL C. DYSART, *Pro Se* | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BANKTRUST, F/K/A, THE PEOPLES | ) | |
| BANK AND TRUST OF SELMA, AL, | ) | |
| ANY SUCCESSOR AND OR ASSIGN OF | ) | CV-10-P-3521-S |
| THE PEOPLES BANK AND TRUST OF | ) | |
| SELMA, AL., | ) | |
| W. BIBB LAMAR, JR., | ) | |
| EDWARD T. LIVINGSTON, | ) | **DEMAND TRIAL BY JURY** |
| ELAM P. HOLLEY, JR., | ) | |
| MAC MARTIN, | ) | |
| ELAINE DELLINGER, | ) | |
| ANDERSON & WEIDNER, F/K/A | ) | |
| ANDERSON & ASSOCIATES, DAVID B. | ) | |
| ANDERSON, DEANNA L. WEIDNER, | ) | |
| RYAN K. COCHRAN, | ) | |
| K. EDWARD SEXTON, II, | ) | |
| STAR PROPERTIES, LLC, STEPHEN | ) | |
| CUMMINGS, III, UNKNOWN PERSONS | ) | |
| A,B,C,D,E,F,G. | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## VERIFIED COMPLAINT

I.      **INTRODUCTION AND NATURE OF THIS ACTION**

1.      On December 17, 2007, The Peoples Bank & Trust Company, Selma, Alabama ("Peoples") became BankTrust ("BankTrust").    (See exhibit 1, attached hereto and fully incorporated herein by reference).    At all times pertinent to this Complaint, the change in ownership had not yet taken  place.   Therefore, in order to minimize confusion, Defendant BankTrust will often be referred to as "Peoples".

2.      This action arises from many violations of several Federal and State statutes  to include, but not limited to:   mail fraud, wire fraud, effect on interstate commerce, fraudulent misrepresentation and intentional concealment of factual information by Defendants, (together) BankTrust ("BankTrust"), W. Bibb Lamar, Jr. ("Lamar"), Edward T. Livingston ("Livingston"), Mac Martin ("Martin"), Elam P. Holley, Jr. ("Holley"), Elaine Dellinger ("Dellinger"), Anderson & Associates, LLC. ("Anderson & Associates"), Anderson & Weidner, ("Anderson & Associates"), David B. Anderson ("Anderson"), Deanna D.  Weidner ("Weidner"), Ryan K. Cochran ("Cochran"), K. Edward Sexton, II ("Sexton"), Star Properties, LLC., ("Star Properties"), and Stephen Cummings, III ("Trey Cummings").

3.      The predicate acts of these Defendants, were discovered on October 15, 2007 when Plaintiff, Nell C. Dysart ("Dysart") became aware that she had just been injured by an unauthorized and wrongful foreclosure on her home. This foreclosure presumably resulted from a property tax default, which Dysart will prove was not the truth.

4.      Dysart will present facts to a reasonable jury evidencing the Defendants' determination, perseverance, skill and precision used under the guise of legal procedure to wrongfully foreclose the mortgage on her home.  It was a foreclosure primarily designed to carry

out a threat made by Defendants in regards to an unrelated business transaction; though Defendants maintain a tax default on the Plaintiff's home as the reason for the foreclosure. Dysart will show how the Defendants very meticulously manipulated the justice system to carry out their well defined scheme. Defendants failed to comply with applicable mortgage guidelines and agreements, as such a condition precedent to acceleration and foreclosure was violated. The foreclosure on Dysart's home is voidable.

5.      Dysart intends to present to a reasonable jury the fact that BankTrust and its associates violated a Court Order when they breached her mortgage contract. Dysart will further show a reasonable jury how the Defendants manipulated state and federal laws to foreclose on her, when in fact the Court Order issued by Judge Thomas Bennett allowed Dysart an opportunity to cure the default on her property. (See EXHIBIT 2, Order – attached hereto and incorporated herein by reference). The terms of the Order were not completed by the tax assessor's office until a month after the foreclosure on her home.    (See EXHIBIT 3, Tax Assessor's Letter – attached hereto and incorporated herein by reference). Thus, she was deprived of the opportunity to cure the default.

6.      The actions of the Defendants has caused the Plaintiff to suffer economically and has caused her to suffer mental anguish, emotional distress, stress, physical discomfort and associated illnesses, as well. As a result of Defendant's behavior, Plaintiff is now suffering from hypertension and is being medicated to control her blood pressure. The level of stress that Plaintiff now suffers from has caused her to be treated for hyperthyroidism, and her eye pressures have become elevated, causing the need for medications to control Glaucoma. (See EXHIBITS  4 , attached medical statements – Dr. Hall and Dr. Arguella, hereto and fully incorporated herein by reference). Plaintiff believes all of these illnesses are related to the

injuries she has received as a result of the Defendants control and participation in the conduct of a "racketeering enterprise". Not only that, but Plaintiff has been forced to live the last several years out of boxes, containers, and suitcases—all with her 94 year old mother "in tow".

7.      Defendant BankTrust's intention was to completely divest Plaintiff of ownership of her property as soon as her automatic stay was lifted. Therefore, Defendants never intended to legally accelerate Dysart's note. Instead a continual pattern of conspiracy and deceit became the object of The Peoples BankTrust Enterprise hereinafter, "TPBE". As October 15, 2007 approached, unknown to Dysart, the Defendants' final assignment was soon to be carried out with Defendant Star Properties taking the lead in the conduct of the enterprise.

8.      By letter dated October 18, 2007, Defendant Anderson made Dysart aware of the enterprise's pattern of conspiracy and deceit. Defendant Anderson was forthcoming with much information that Dysart would not have otherwise had the chance of knowing. In the letter, he informed Dysart that Defendant Sexton had been negligent in his duty of representing her, that Defendant Sexton conspired with him and with Defendant Weidner, and that Defendant Sexton withheld information that Dysart should have had knowledge of. This Court must see through the allegations contained in Defendant Anderson's letter. It is this letter that primarily supports Dysart's assertion of "racketeering activities" by the Defendants. (See EXHIBIT 5, letter–attached hereto and fully incorporated herein by reference).

9.      Attached as Exhibit 3, is document entitled Tax Assessor Letter dated November 28, 2007. This document shows the correct accounting of taxes due on Plaintiff's residence. The amount due was not known to anyone until calculations were complete at which time, this

document would be generated.  Dysart's home was foreclosed on without anyone's knowledge as to what was owed on the home.

10.    As a direct and proximate result of the egregious conduct alleged herein, all Defendants each directly and proximately injured Dysart by:

        a.    conspiring and willfully concealing conversations and/or negotiations regarding an accounting or an amount necessary to bring Dysart's property taxes current;

        b.    withholding a material fact that a foreclosure was in process, in violation of the clauses contained in Dysart's note and mortgage;

        c.    using improper and illegal tactics to wrongfully foreclose the mortgage on Dysart's home.

11.    Dysart, on behalf of herself, brings this action to recover for these damages and others, which attribute directly to the Defendant's fraudulent scheme(s).  Dysart's claims are asserted under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, et.seq.) and related federal and state law statutory and common law claims. Additionally, Dysart brings this claim as to the privilege due, but not afforded her in paragraph #22 of the Fannie Mae/Freddie Mac UNIFORM INSTRUMENT mortgage document that she signed along with Peoples Bank & Trust on August 30, 2002.

## II.    PARTIES

12.    Plaintiff Nell C. Dysart ("Dysart" or "Plaintiff") is an adult individual and is domiciled in Jefferson County and a resident in the State of Alabama in this judicial district.

13.     Defendant BankTrust of Alabama ("BankTrust") (f/k/a) The Peoples Bank and Trust Company of Selma, Alabama is an Alabama banking corporation with its principal place of business in Mobile, Mobile County, Alabama.   At all times pertinent to this Complaint, BankTrust (a/k/a The Peoples Bank & Trust Company)   materially participated, conducted, conspired, directed, assisted, encouraged and/or otherwise aided and abetted, and/or associated with the conduct of the Enterprise, in this judicial district.

14.     Defendant W. Bibb Lamar, Jr. ("Lamar") is an adult individual and is a resident in the State of Alabama.  At times relative to this Complaint, Lamar was Chairman and CEO of Defendant BankTrust, and as such controlled and associated with the conduct of TPBE.

15.     Defendant Edward T. Livingston ("Livingston") is an adult individual and is a resident in the State of Alabama.  At times relative to this Complaint, Livingston was President and CEO of The Peoples Bank & Trust Company, and as such controlled and associated with the conduct of TPBE.

16.     Defendant Mac Martin ("Martin") is an adult individual and is domiciled in Dallas County and a resident in the State of Alabama.  At all times relevant to this Complaint, Martin was an employee of Defendant BankTrust, and as such associated with the conduct of TPBE.

17.     Defendant Elam P. Holley, Jr. ("Holley") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama.  At times relevant to this Complaint, Holley was President and CEO of The Peoples Bank & Trust Company, and as such controlled and associated with the conduct of TPBE.

18.     Defendant Elaine Dellinger ("Dellinger") is an adult individual and is domiciled in Dallas County and a resident of the State of Alabama.  At times relevant to this Complaint, Martin was an employee of Defendant BankTrust, and as such associated with the conduct of TPBE.

19.     David B. Anderson & Associates, LLC,  now known as Anderson & Weidner, LLC ("Anderson & Associates") is an Alabama law firm with its principal place of business in Birmingham, Jefferson County, Alabama.  At all times relevant to this Complaint, Anderson & Associates materially participated, conspired, directed, assisted, encouraged and/or otherwise aided and abetted Defendants, individually, collectively, and/or associated with the conduct of the TPBE, in this judicial district.

20.     David B. Anderson ("Anderson") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama.  At all times relevant to this Complaint, Anderson was a principal in Anderson & Associates, and as such associated with the conduct of TPBE.

21.     Ryan K. Cochran ("Cochran") is an adult individual and is domiciled in the State of Tennessee.  At times relevant to this Complaint, Cochran was an employee of Defendant David B. Anderson, and as such associated with the conduct of TPBE.

22.     Deanna L. Weidner ("Weidner") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama.  At all times relevant to this Complaint, Weidner was an employee of Defendant David B. Anderson, and as such associated with the conduct of TPBE.

23.     K. Edward Sexton II ("Sexton") is an adult individual and is domiciled in Jefferson County and a resident in the State of Alabama.  At all times relevant to this Complaint, Sexton was a principal and/or employee of Evans & Sexton, and as such associated with the conduct of TPBE.

24.     Star Properties LLC  ("Star Properties") is an Alabama real estate investment company with its principal place of business in Birmingham, Jefferson County, Alabama.  At times relevant to this Complaint, Star Properties materially participated, facilitated, conspired, assisted, encouraged. aided or abetted, and/or otherwise associated with the conduct of TPBE, in this judicial district.

25.     Defendant Stephen Cummings III ("Cummings") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama.  At all times relevant to this Complaint, Cummings was an agent, employee or principal of Star Properties, and as such associated with the conduct of TBPE.

## III.     JURISDICTION AND VENUE

26.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's Complaint in that claims arise under a federal statute, namely the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., or federal common law.  This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367, as such claims are related to these claims which this Court has jurisdiction under 28 U.S.C. § 1331 and that such claims form a part of this same case.  Claims for Relief in this action arise under:

a.     **28 U.S.C. § 1331**, in that these claims arise under federal statutes;

b.     **28 U.S.C. § 1367**, in that all other claims so related to claims within this original jurisdiction that they form part of the same case or controversy under Article III of the Constitution of the United States;

c.     **28 U.S.C. § 1332(a)(1),**   in that there is diversity of citizenship and the amount in controversy exceeds $75,000.00;

d.     **18 U.S.C. § 1961(1)**,  "racketeering activities";

e.     **18 U.S.C. § 1962 (c)**,  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt;

f.     **18 U.S.C. § 1962(d),**  It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section;

g.     **18 U.S.C. § 1341,**  (Mail Fraud) Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ... any matter or thing whatever to be sent or delivered by the Postal Service ...;

h.     **18 U.S.C. § 1343,**   (Wire Fraud) Whoever, having devised or intending to devise any scheme or artifice to defraud, or for  obtaining money or property by means of false or fraudulent pretenses, ... transmits or causes to be transmitted by means of wire, ... in interstate commerce, any writings, signs, signals, pictures, or sounds ... ;

i.     **18 U.S.C. § 1344(2),**   (Bank Fraud) Whoever knowingly executes, or attempts to execute, a scheme or artifice to obtain any of the  moneys, funds, credits, assets, securities, or other proper owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises ...;

j.     **18 U.S.C. § 1505,**   (Obstruction of Proceedings) Whoever, corruptly attempts by threats or force, or by any threatening letter of communication, influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States;

j.     **15 U.S.C. § 1509,**   (Obstruction of Court Orders) Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States ...;

    k.  **11 U.S.C. § 362(k)(1),** … an individual injured by any willful violation of a stay provided by this section shall recover actual damages, … may recover punitive damages;

    l.  **18 U.S.C. § 1964(c),** (Relief) Any person injured in his business or property by reason of a violation of Section 1962 may bring a RICO action and shall recover threefold the damages, plus attorney's fees;

    m.  **15 U.S.C. §1692 et seq.** ; **Fair Debt Collection Practices Act**

    n.  **Code of Alabama 1975, § 6-5-280** (Breach of contract);

    o.  **Code of Alabama 1975, § 6-5-101** (Fraud);

    p.  **Code of Alabama 1975, § 6-5-102** (Suppression of material facts);

    q.  **Code of Alabama 1975, § 6-5-104** (Fraudulent deceit);

    r.  **Code of Alabama 1975, § 35-4-153** (Fraud or mistake. When, through fraud … a deed. mortgage or other conveyance does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved…. ;

    r.  **Code of Alabama 1975, § 35-10-1** (Power of sale constitutes part of security; by whom executed; effect of conveyance; index of foreclosure. Where a power to sell lands is given to the grantee in any mortgage …);

    s.  **Code of Alabama 1975, § 35-10-8** (How notice of sale given. Notice of said sale shall be given in the manner provided in such mortgage …);

    t.  **Code of Alabama 1975, § 35-10-9** (Sales contrary to article null and void. All sales of real estate, made under powers contained in mortgages or deeds of trust contrary to the provisions of this article, shall be null and void, notwithstanding any agreement or stipulation to the contrary).

  27.  Venue is proper in the United States District Court of the Northern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1391(a)(b)(c). All Defendants are subject to personal jurisdiction in this district.   Defendants BankTrust a/k/a/ The Peoples Bank and Trust Company, Anderson & Associates LLC,  Star Properties LLC are corporations that are subject to personal jurisdiction in this judicial district; therefore, are deemed to reside in this judicial district. Defendants also advertised in this judicial district, and received revenue and

profits from the sale of Dysart's home in this judicial district.   Defendants made material misrepresentations and omissions in this judicial district.   Therefore, a substantial part of the acts and omissions giving rise to Dysart's claims occurred in this judicial district.

## IV.    FACTS

### PATTERN OF RACKETEERING IN THE WORKS

28.    This deception began prior to **March 2004**.  On March 10, 2004, Dysart went into the Woodstock branch of Peoples Bank with the intent of making her March mortgage payment. She had just made her February payment on February 27, 2004.   Her March payment was not accepted and no reason was given as to the refusal to accept it.  Instead Branch Manager, Rhonda Cook told Dysart to call Mac Martin, an employee of BankTrust.  Ms. Cook wrote Defendant Martin's number down and gave it to Dysart.   Dysart called, but Defendant Martin never returned any of Dysart's calls, and Peoples continued to refuse Dysart's mortgage payments. (See EXHIBIT 6, Martin  - attached hereto and fully incorporated herein by reference).

29.    Defendant Anderson & Associates is a "Debt Collector"  (See EXHIBIT 7, D/C letter – attached hereto and fully incorporated herein by reference).  Anderson & Associates began collection measures on Dysart in March of 2004.   By letter dated **March 8, 2004**, Attorney Ryan K. Cochran sent Dysart a letter improperly accelerating her mortgage.  (See EXHIBIT 8, Fannie Mae/Freddie Mac sheet) Dysart had not received this letter when she visited Peoples Bank on **March 10, 2004**.

30.    By letter dated **March 11, 2004**, a few days after Dysart was in the branch of People's Bank & Trust, she received a letter from Attorney Ryan K. Cochran.  The first sentence of Mr. Cochran's letter was "The Peoples Bank and Trust Company ("Peoples Bank") has

advised me that you contacted them in an effort to cure the default on your mortgage.".   Mr. Cochran stated that the bank had contacted him in order to collect a debt from Dysart, in the amount of $3,117.36, which included $500.00 for attorney's fees.   Dysart was not given any accounting for that amount and thought she only owed her March 2004 mortgage payment, which was $1,034.00.

31.    At the same time, Dysart's company was indebted to Peoples for approximately $115,000.00, for an unsecured capital injection loan, which was also personally guaranteed by Dysart.  Peoples had made many attempts to get Dysart to collateralize the loan with her home. There had never been any discussion about restructuring the commercial loan to extend to Dysart's personal property.   There was no clause in Dysart's loan document stipulating that Dysart would allow her personal home to be used as collateral at no time then, nor any time in the future. (See EXHIBIT 9, loan agreements – attached hereto  and fully incorporated herein by reference).   Therefore Dysart continued to refuse, which became problematic for Defendant Peoples.

32.    On **March 15, 2004**, Peoples Bank & Trust filed a lawsuit against Dysart for an unsecured business loan that Dysart was allegedly guarantor for.  (See EXHIBIT 10, EMER Complaint – attached hereto and fully incorporated herein by reference).  As a type of measure for EMER's ability to repay the "capital injection" loans, Peoples was presented with unofficial budgetary letters from Paul B. Krebs & Associates, Inc. as proof of Jefferson County's intent to contract with Dysart's company. The bank used these budgetary letters to base their loan approvals on. (See EXHIBIT 11, January and June 2002 letters – attached hereto and fully incorporated herein by reference).

**THREAT FROM PEOPLES BANK AND TRUST COMPANY**

33.     When the company loan came due, Dysart was not in a position to pay it because she, a utility contractor for the Jefferson County Environmental Services Department became the victim of what was to become one of the worst scandals – involving local officials – in the history of Birmingham, Alabama. On **July 16, 2004**, Peoples threatened to foreclose on Dysart's home if she did not allow them secure the unsecured commercial loan with her personal residence. (See EXHIBIT 12, Ryan Cochran's Letter – attached hereto and fully incorporated herein by reference). Foreclosure on her home was Peoples way of retaliating against Dysart and punishing her for not collateralizing her company's commercial loan. Dysart can show that even years after the foreclosure, BankTrust still makes reference to the caveat regarding the unsecured loan that Dysart personally guaranteed and discharged in a Chapter 7 proceeding.

34.     She reinstated her mortgage in the amount of $14, 119.17 on **August 13, 2004**, which by that time had accrued many charges and excessive legal fees. (See EXHIBIT 13, Copy of reinstatement check – attached hereto and fully incorporated herein by reference). Dysart remained current thereafter. (See EXHIBIT 14, Letter from Peoples to Alta for refinance – attached hereto and fully incorporated herein by reference).

**START OF RELATIONSHIP WITH THE PEOPLES BANK & TRUST COMPANY**

35.     In the summer of 2000, Dysart and the three eldest of her four sons formed an underground construction utility company, namely Environmental Management & Emergency Response, Inc. ("EMER"). Its primary purpose was to install sanitary sewers and appurtenances. And its primary customer at the time was the Jefferson County Environmental Services Department of Jefferson County, in Birmingham, Alabama. There was no outside debt incurred

in the start up of the company. Dysart used her retirement and severance pay from her job as an IT Disaster Recovery Administrator. She had been in the data processing/information technology field for approximately 20 years. Prior to starting the company, she had been responsible for the backup, archival, and retrieval of computerized onsite and off-site data. Her son Stuart, president of the company, with a Masters Degree in Environmental Management, assisted with capital for the company with a HELOC.

36.     Over the next few years, Dysart's company grew exponentially because she and each of her sons had the necessary training, skills, experience, qualifications, and educational background to run the company from all aspects of its operation. Each one had a particular administrative portion of the business to be responsible for. And each one worked alongside employees in the trenches, as well. The only resource that Dysart did not have was the availability of cash at all times. That is where The Peoples Bank and Trust Company of Selma came in.

## DYSART DEPOSITED AN AVERAGE OF $162,000.00 PER MONTH INTO PEOPLES BANK & TRUST COMPANY

37.     Sometime during the middle of **August, 2000**, Dysart opened up checking accounts at Peoples Bank & Trust – Helena, Alabama. Dysart's general operating account grew from its initial $500.00 opening deposit to monthly deposits – some to exceed monthly amounts of $270,000.00. (See EXHIBITS 15, General Operating Statements – attached hereto and fully incorporated herein by reference). Dysart's monthly revenue was derived primarily from contracts with the Jefferson County Commission. Dysart, with the assistance of her sons, ran a very conservative business. Her main goal was to get the work done. Finish a contract. Then

14

move on to the next job.  Her work was professional, swift, efficient, and passed all environmental and engineering inspections.  She has always had a no nonsense approach to work, which she instilled in her sons from an early age.

38.    With Dysart's monthly deposits into Peoples Bank & Trust averaging around $162,821.58, Dysart seemingly was a good risk for a small unsecured capital injection line of credit.  So along with Dysart's deposit history and an unofficial letter of anticipated work from Jefferson County Environmental Services' contract manager, Paul B. Krebs & Associates, Inc., Peoples Bank & Trust extended to EMER such a credit line, with Dysart being a guarantor for the loan.  (See EXHIBIT 9, LOC – attached hereto and incorporated herein by reference). Dysart's monthly deposits were large, but so were her expenditures.  Her intent was to pay off her millions of dollars worth of debt within 3-5 years, therefore, in doing so she did not build a large cash reserve.

## JEFFERSON COUNTY COMMISSIONERS INDICTMENTS AND CONVICTIONS HAD AN ADVERSE EFFECT ON DYSART'S COMPANY

39.    During the fall of **2002**, EMER's work began to slow down.  As much as Dysart questioned those in charge of the work about this, no one seemed to know the reason for the slowed down pace.  But what was known was that Jefferson County was still under a Consent Decree from the Justice Department to rehabilitate its sanitary sewer system;  therefore, for the most part it was assumed that the internal problem that existed was one that was to be cleared up and Dysart and other contractors would be back to work in full force.  Only those involved in the "sanitary sewer corruption case" knew what was brewing and what was about to explode and

linger for years to come. In spite of the difficulties, Dysart continued to struggle as long as she could to make the business work.

40.     Knowing the nature of her work – when it's finished, it's done, it was Dysart's attempt to become debt free once again by the time the rehabilitation of the sewer system was completely finished. Therefore, the debts that she assumed for heavy equipment, heavy rolling stock, real property to facilitate her business, and other inventory for the necessary work of her business, now became a liability that she could not service. Her debt load was too great and she did not have contracts to take care of the monthly expenses which were structured in the thousands of dollars per month. As stated, her intent was to have her assets free and clear within three to five years. So she reinvested all of her money back into the business to pay off debt. But with no contracts, she could not continue to pay the debts that were owed.

## DYSART TRIED TO SAVE HER BUSINESS, AND WORK WITH CREDITORS

41.     In an attempt to keep her company in business, Dysart, on the advice if Defendant Sexton, Dysart met with Attorney Fred Garfield, to discuss filing a Chapter 11 Reorganization Plan for her company. She knew the Chapter 11 would allow her employees to keep their jobs, also enable her to work with the Creditors, and get the company back on its feet as well. Unfortunately, she could not afford the legal fees needed to accomplish that. Therefore, regrettably, she was left with no other alternative but to file Chapter 7, on the advice of her attorney Eddie Sexton.

## THE MAIN REASON THAT DYSART FILED CHAPTER 7 BANKRUPTCY WAS TO PREVENT THE INTERNAL REVENUE SERVICE FROM FILING A TAX LIEN ON HER HOME – NOT TO STAY A FORECLOSURE OF HER MORTGAGE

42.     It was never the intent, nor the purpose that Dysart file bankruptcy to avoid her home being foreclosed on.  Dysart owed federal employee trust taxes, which she could not pay. After being contacted by the Internal Revenue Service, and after realizing that she could not file a Chapter 11 Reorganization Plan, Dysart filed the Chapter 7.  (See EXHIBITS 16, IRS forms – attached hereto and fully incorporated herein by reference).

43.     Dysart was over $2,000,000.00 in debt when she was forced to file for bankruptcy protection under Chapter 7.  With no contracts from her primary customer, who was Jefferson County, Dysart could not service her company's debt.   After Creditors' repossession of equipment and inventory, Dysart still was left with an enormous debt well over $1,000,000.00. (See EXHIBIT 17, Chapter 7 Schedule or signature page – attached hereto and fully incorporated herein by reference).  On **August 03, 2004**, Dysart was discharged of $1,079,729.40 worth of debt.  The $115,000.00 owed to Peoples was included in that amount. That angered Peoples.

44.     Employee trust taxes and property taxes for three properties assessed to Dysart were also included in the Chapter 7 schedule.  (See EXHIBIT 18, Taxes sheet – attached hereto and fully incorporated herein by reference).   However, it was intended that those taxes be made part of a subsequent Chapter 13 plan, which was filed on **October 26, 2004**.

45.     In an effort to keep her mortgage, as well as her ever increasing Chapter 13 payment current, Dysart transported FEMA trailers from Wakarusa, IN to Baton Rouge, LA. (See EXHIBIT 19, Horizon Transport – attached hereto and fully incorporated herein by reference).  Sometimes, Dysart would be forced to take her 90 year old mother along on those treacherous trips because of the added cost of sitter care for her mother.

## DEFENDANT PEOPLES BANK AND TRUST COMPANY KNEW OF DYSART'S TAX DELINQUENCY

46.     In his letter to Dysart dated **October 18, 2007**, Defendant Anderson states that they (Defendants) did not know of the tax problems until they were contacted regarding property insurance.  (See EXHIBIT 5, Anderson's letter – attached hereto and fully incorporated hereto by reference).  That would have been some time in 2006.  What Defendant Anderson states is false. In or around **March 2004**, Defendant Anderson knew that Dysart's 2003 taxes were delinquent and not paid.

47.     In or around **March 2004**, Defendant Peoples knew that Dysart was delinquent in her 2003 property taxes.   On **June 04, 2004**, Defendant Cochran filed a Motion to Lift Automatic Stay.  At paragraph #4, Defendant Cochran states *"A **March 2004** title search of the mortgaged property revealed that 2003 ad valorem taxes were due and delinquent."*  (See EXHIBIT 20, Motion to Terminate Automatic Stay – attached hereto and fully incorporated herein by reference).   Defendant Peoples ran that title search at least one month before Dysart filed a Bankruptcy proceeding under Chapter 7.  This was done in preparation of a foreclosure on Dysart's home, as per letter from Defendant Cochran dated **March 8, 2004**.  (See EXHIBIT 7, Letter from Defendant Cochran – attached hereto and fully incorporated herein by reference).

48.     Nevertheless, it was Defendant People's execution of the **July 19, 2004** threat to retaliate for Dysart's discharge of an unsecured amount of money owed to them, that the Defendants' association and participation with TPBE wrongfully foreclosed on Dysart's home and caused her injury.

### "Elements" of Wrongful Foreclosure in Alabama are:

(1) **the actions of the mortgagee were either outside the boundaries of the foreclosure or taken for some purpose other than to secure the debt owed by the mortgagor;**

(2) **the actions of the mortgagee were for some ulterior motive;**

(3) **the power of sale was perverted or used for the mortgagee's or someone else's purpose; or**

(4) **the mortgagee had an ill motive.** (See EXHIBIT 21, from Sharpe v Wells Fargo - attached hereto and fully incorporated herein by reference).

## DYSART'S PROPERTY SOLD FOR TAXES IN VIOLATION OF THE AUTOMATIC STAY

49.     Dysart's tax problem was the result of two tax overbid sales that the Bankruptcy Court ordered as void on **September 4, 2007**. (See EXHIBIT 2, Order – attached hereto and fully incorporated herein by reference).   On **April 12, 2004** Dysart filed for protection under Chapter 7 of the United States Bankruptcy Code.   Dysart listed the delinquent taxes on her residence in the Chapter 7 schedule. (See EXHIBIT 18, Tax schedule – attached hereto and fully incorporated herein by reference).   However, the Jefferson County Tax Collector sold her property at a tax sale.  Dysart tried several times to get the tax problem resolved.  On **March 1, 2006**, Dysart went in to see Gary Boyd about paying the amount of taxes due, only to find out that the property could not be redeemed.  There was nothing that Dysart could do.  Mr. Boyd told her that even if she did get a loan, she still could not redeem her property. (See EXHIBIT 22, Redemption Inquiry Screen Shot – attached hereto and fully incorporated herein by reference).

## FORECLOSURE SALE WAS NOT VALID AS PROPERTY SOLD BEFORE SCHEDULED TIME

50.     Dysart first became aware of the improper and illegal acts of the Defendants on **October 15, 2007** at or around 10:51 AM, when she received a call from a gentleman who identified himself as Rudy James.  (See exhibit 23, Nextel telephone record attached hereto and fully in corporate herein by reference).  Mr. James asked how much she was selling her house for.  She told him, he then replied that her home had just been foreclosed on.  He told Dysart that he wanted to bid on her house, but got to the courthouse too late.  (See exhibit 24, foreclosure ad for time attached hereto and fully incorporated herein by reference).

51.     On **October 15, 2007**, Dysart immediately called Sexton to inform him of the phone call and to find out what was going on.  Sexton told her that he did not know of the foreclosure and that he would call Ms. Weidner to find out.  He asked if the caller said that the house would be foreclosed on or that it had foreclosed on.  Dysart called Mr. James just to make sure of what he said.  Mr. James then said that the foreclosure had been cancelled and that he did not have time to talk to her, but would call her back later.  When Mr. James called back, he told Dysart that the foreclosure had gone through.

52.     On or about **October 15, or 16, 2007**, in a telephone conversation with Defendant Weidner, Dysart asked why she had not been given notice of the foreclosure.   Defendant Weidner responded that under Alabama law, she was not required to give Dysart notice. Defendant Weidner went on to give Dysart the dates the foreclosure ad had been run in the Alabama Messenger. (*RICO Violation mail fraud1341*) Weidner was in violation of Code of Alabama 1975 35-10-1 and 35-10-8. The statute states to follow the procedures for foreclosure contained in the security instrument.  (See exhibit 25, Codes 35-10-1, 35-10-8 attached hereto and fully incorporated herein by reference). ( See EXHIBIT 26,  Mortgage attached hereto and fully incorporated herein by reference).

53.     After the foreclosure, Dft Sexton told Dysart that Dft BankTrust had wrongfully foreclosed on her and that if she redeemed her property, she would bar any future recovery for damages.  Even though Dysart had moved out of her home to preserve her right of redemption, based on advice from Sexton, she did not pursue redemption of the property. (See EXHIBIT __ Sharpe v Wells Fargo Court Discussion, attached hereto and fully incorporated herein by reference).

## DYSART TRIED TO PAY TAXES

54.     Dysart finished the unfinished basement in her home to add value and increase her equity, for the purpose of paying out of Bankruptcy, which would have paid the taxes as well.  However Dysart was told and shown by Gary Boyd that she could not pay the taxes, even if she had the money.  (See EXHIBIT 22, "DO NOT ALLOW REDEMPTION" attached hereto and fully incorporated herein by reference).

55.     After the Court Order of September 4, 2007, Dysart contacted Gary Boyd to see how much her taxes were.  He told her that no one would know how much her taxes were until sometime after November 15, 2007.  (See EXHIBIT 2, Order attached hereto and fully incorporated herein by reference).  He told her to call back after that date.  It was after the conversation with Mr. Boyd that Dysart asked her attorney, Defendant Sexton to see how much Peoples would take on an unknown tax bill.  This was done out of good faith, as Dysart was prohibited from redeeming the property.  Dysart asked her attorney to start with a minimum amount on $300.00, but if that was not satisfactory, she wanted to know how much.  Peoples never responded to Dysart.

## DEFENDANTS WEIDNER AND CUMMINGS WERE NOT TOGETHER AT THE JEFFERSON COUNTY COURTHOUSE AT 11:00AM ON OCTOBER 15, 2007

56. On **October 19, 2007**, Dysart sent an email to Melinda Dawson, legal assistant to Anderson and Weidner, inquiring as to the name of the purchaser(s) of her home. In reply to Dysart's request, Defendant Weidner stated that she had spoken to an individual named Trey Cummings. (See EXHIBIT 27, email attached hereto and fully incorporated herein by reference). It is Dysart's belief that the foreclosure sale of her home is invalid because Mr. James' call to Dysart on **October 15, 2007** was before 11:00am – the legal time of sale for the home. Defendant Weidner's email further suggests to Dysart that the transaction was done by phone, not "in front of the main courthouse door", neither was it done at the appropriate time. (See EXHIBIT 24, advertising, attached hereto and fully incorporated herein by reference). *RICO violation wire fraud 1343, mail fraud 1341*

## STAR PROPERTIES PURCHASED DYSART'S HOME BEFORE 11:00AM ON OCTOBER 15, 2007, IN VIOLATION OF ALABAMA AND ADVERTISING

57. Defendant Star Properties' purchase of Dysart's residence before the scheduled time, eliminated other possible bidders. (See EXHIBIT 25, Code of Alabama 1975 6-5-101, and fully incorporated herein by reference). Star Properties' purchase of Dysart's home affected interstate commerce and constituted bank fraud. *RICO Violation 1962(c), 1344(2)* Allegedly Star Properties has a history of fraudulent real estate investment activities, which is likely to continue: ***Phillips v Star Properties*** *– CV-0404670 Refusal to allow Redemption;* ***Hovies v. Star Properties*** *– CV-055939 1 W/ F/C, Fraud,Conversion, etc.;* ***Wallace v. Star Properties*** *– CV-2010-904003 F/C Fraud, Conversion, etc.*

22

## DYSART'S NOTE AND MORTGAGE NEVER WAS   PROPERLY ACCELERATED. BUT IF IT HAD BEEN, SHE COULD HAVE REINSTATED HER MORTGAGE IF SHE HAD BEEN GIVEN THE OPPORTUNITY TO EXERCISE HER RIGHT TO DO SO

58.    "**Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; ...." **(Mortgage at Paragraph 19, Fannie Mae/Freddie Mac UNIFORM INSTRUMENT)** If Dysart, personally did not have all of the funds necessary to reinstate the mortgage, Dysart's son had agreed to give her the difference.  However, on the date of the foreclosure, **no one in the world knew what the amount of the taxes was.**  (See EXHIBIT 28, Stu – attached hereto and fully incorporated herein by reference).

## DEFENDANT SEXTON KNEW OR SHOULD HAVE KNOWN THAT DYSART COULD HAVE POSITIONED HERSELF TO KEEP HER HOME OUT OF FORECLOSURE

59.    Defendant Sexton was well aware of the fact that Dysart was working on a residential development with her son.  See EXHIBIT 29, Metro loan – attached hereto and fully incorporated herein by reference).  He also had expressed an interest in being the closing attorney for the subdivision.  On or around **December 13, 2006**, Defendant Sexton presented to Dysart's son, a Letter of Intent to purchase lots in the subdivision, as he was working with real estate investors.  (See EXHIBIT 30, LOI attached hereto and fully incorporated herein by reference).  Defendant Sexton later put Dysart in contact with an investor only known as "Jose".  Through Jose, local businessman, Books Emory met with Dysart at the subdivision.  Dysart was

already acquainted with Mr. Emory because her company had installed the sanitary sewer infrastructure in a subdivision that he had developed a few years back. Again, Defendant Sexton knew or should have known that if Dysart had known of the pending foreclosure, then she would have been proactive and prevented it from happening.

## STAR PROPERTIES ILLEGALLY PLACED DYSART'S HOME IN THE STREAM OF COMMERCE

60. On **December 06, 2007,** Defendant Trey Cummings listed Dysart's home for sale. On that date, Cummings' Broker was Keller Williams Realty Hoover, Alabama. The property known also as MLS #363777 was advertised on the Birmingham Area Multiple Listing Service's website, as well as on Keller Williams Realty's website, thereby giving the property World Wide Web exposure, which constituted an effect on interstate commerce.

## IN COMPIANCE WITH THE COURT'S ORDER OF SEPTEMBER 4, 2007, DEFENDANTS, COULD NOT FORECLOSE UNTIL A RECONSILIATION OF THE TAXES DUE WAS COMPLETED

61. Tax reconciliation was not completed until November 28, 2007. (See EXHIBIT 3, Tax Assessor Letter attached hereto and fully incorporated herein by reference).

## DEFENDANTS COULD NOT HAVE LEGALLY OR TECHNICALLY FORECLOSED ON DYSART'S HOME UNTIL SOMETIME AFTER JANUARY, 2008

62. Defendant was required by law to give Dysart a 30 day's notice prior to acceleration. Defendants failed to comply with the law. (See EXHIBIT 8, Fannie Mae attached hereto and fully incorporated herein by reference).

## LIFTING OF THE AUTOMATIC STAY ON SEPTEMBER 4, 2007 GAVE DEFENDANTS THE LEGAL AUTHORITY TO FORECLOSE

63.     The authority to foreclose was contained in the Uniform Instrument, FDCPA 15 U.S.C. § 1692 et seq, and Code of Alabama 1975, § 35-10-1 .  **Defendants violated of each of the preceding statues or conditions.**

64.     The Defendants began plotting this scheme around February or March 2004. From February or March, 2004 thru December 2007 or early 2008, the Defendants conducted the affairs of TPBE through a continuous pattern of racketeering activity which involved multiple predicate acts to include mail and wire fraud.   Violations and predicate acts are detailed hereinafter.

**18 U.S.C. § 1962(c) The Enterprise**

65.     Each Defendant in this Complaint is a "Person" under 1 U.S.C. § 1. Each Defendant is this Complaint is a "Person" under 18 U.S.C. § 1961(3).  Defendant BankTrust f/k/a The Peoples Bank & Trust Company of Selma, Alabama formed an association-in-fact enterprise with Defendants, (together) BankTrust, W. Bibb Lamar, Jr., Edward T. Livingston, Mac Martin. Elam P. Holley, Jr., Elaine Dellinger, Anderson & Associates, LLC., Anderson & Weidner, David B. Anderson, Deanna D. Weidner, Ryan C. Cochran, K. Edward Sexton, Star Properties, LLC., and Stephen Cummings, III, namely The Peoples BankTrust Enterprise, ("TPBE"). The Defendants (together, "TPBE") are an enterprise associated-in-fact and operated together for the common purpose of conspiring to divest Dysart of her home.

66.     BankTrust and its employees role in TPBE was to conduct, oversee and direct the conduct of the affairs of the enterprise.  Anderson & Associates, LLC, Anderson & Weidner,

__, and David Anderson's role in TBPE was to actively participate in, manage, conduct, oversee and direct the conduct of the affairs of the enterprise. Deanna Weidner and Ryan Cochran's role in TPBE was to actively participate in the conduct of the affairs of the enterprise by carrying out orders of BankTrust and David Anderson. Eddie Sexton's role in TPBE was to actively participate in the conduct of the affairs of the enterprise, directly or indirectly by conspiring with David Anderson and Deanna Weidner to intentionally conceal or suppress vital information that Dysart relied on. Such was information that Sexton had a fiduciary duty to disclose to Dysart. But that he failed to do, causing Dysart to be injured by his suppression of information. Star Properties, LLC. and Stephen Cummings, III's role in TPBE was to conspire with David Anderson and Deanna Weidner to actively participate in the conduct of its affairs indirectly by fraudulently purchasing Dysart's home. As Star Properties, LLC's regular way of doing business has been to fraudulently acquire real property. Star Properties, LLC's fraudulent activity is likely to continue.

67.     The Defendants individually and/or collectively, knowingly and willfully associated with TPBE, and directed, managed, conducted and participated in the conduct of TPBE's affairs, directly and indirectly, by playing significant roles in the facilitation of the unauthorized and wrongful foreclosure of Dysart's home by among other things, failing to disclose pertinent information to Dysart, and failing to give Dysart the required notice due to her under clause #22 of her mortgage. The Defendant's conduct was in violation of the Fannie Mae/Freddie Mac uniform mortgage instrument and in violation of Code of Alabama 1975 § 35-10-1 as well as Code of Alabama 1975 § 35-10-8. The Peoples BankTrust Enterprise would have continued as long as the Automatic Stay was in effect.

**PREDICATE ACTS AND DATES BY DEFENDANTS ASSOCIATED-IN-FACT WITH THE PEOPLES BANKTRUST ENTERPRISE ("TPBE")**

*PATTERN OF RACKETEERING ACTIVITY*

68.   **18 U.S.C. § 1341 (Mail Fraud)**

Violation:

15 U.S.C. § 1692c.(a)(2)

15 U.S.C. § 1692d.(1)(3)(4)

15 U.S.C. § 1692e.(5)

15 U.S.C. § 1692f. (6)(A)

15 U.S.C. § 1692g.(a)(d)

Code of Alabama 1975, § 6-5-280 – Breach of Contract

Code of Alabama 1975, § 35-4-153 – Fraud or Mistake, Deed Conveyance

Code of Alabama 1975, § 35-10-1 – Power of Sale

Code of Alabama 1975, § 35-10-8 – How Notice of Sale Given

Code of Alabama 1975, § 35-10-9 – Sales Contrary to Article Null and Void

Dates and Description of Violations:

**Date(s): Unknown**   Advertising Birmingham News -- Dft Trey Cummings

**September 22, 2007**   Advertising Foreclosure in Alabama Messenger - Weidner

**September 29, 2007**   Advertising Foreclosure in Alabama Messenger - Weidner

**October 6, 2007**   Advertising Foreclosure in Alabama Messenger - Weidner

**July 31, 2004**   Advertising Foreclosure in Alabama Messenger - Weidner

**August 7, 2004**   Advertising Foreclosure in Alabama Messenger - Weidner

**August 14, 2004**   Advertising Foreclosure in Alabama Messenger - Weidner

69. **18 U.S.C. § 1343 (Wire Fraud)**

Dates and Description of Violations:

**July 6, 2004**        Defendant Cochran: fax to collect @ $114,000.00 –
Automatic Stay in effect.

**July 19, 2004**        Defendant Cochran: fax/threat to collect @ $114,000.00 –
Automatic Stay in effect.

**October 15, 2007**        Defendant Weidner: telephone conversation/foreclosure
transaction with Defendant Trey Cummings.

**October 18, 2007**        Defendant Anderson's letter admitting *numerous*
conversations with Defendant Sexton regarding Dysart's foreclosure, in which
information that Dysart should have been made aware of, was intentionally
withheld from her.

**December 06, 2007**   Defendant Cummings: Birmingham MLS' website – daily
exposure and daily electronic hard or wireless transmissions.

**December 06, 2007**   Defendant Cummings: Keller Williams' website – daily
exposure and daily electronic hard or wireless transmissions.

70. **18 U.S.C. § 1344 (Bank Fraud)**

Dates and Description of Violations:

**August 13, 2004**        Dysart re-instated her mortgage to Peoples.   When Dft
Anderson accepted payment from Peoples for services rendered, he was in
violation of section 1344(2), as the funds that Dysart paid were a part of the
scheme of racketeering.

**October 15, 2007**    Dysart's home was foreclosed on. Any funds from the sale of her home were "under the control" of Defendant Peoples. Section 1344(2) had been violated in that the foreclosure was improper and illegal. Defendants Anderson and Weidner did not follow proper procedure; therefore, they were not authorized to bring the foreclosure action against Dysart.

**October 15, 2007**    Defendant Star Properties, associating-in-fact fraudulently purchased Dysart's home, violating U.S.C. § 1344(2) by putting bank customers at risk of loss by TPBE's scheme.

**December 26, 2007**    Defendant Dellinger, issued to Dysart an "excess funds – from the foreclosure" check in the amount of $3,606.13. Defendant Dellinger violated Section 1344(2) in that funds in control of Peoples derived from the wrongful foreclosure of Dysart's home put bank customers at risk of loss because of the scheme perpetrated by TPBE.

71.    **18 U.S.C. § 1962(d) (Conspiracy)**

Dates and Description of Violations:

**October 18, 2007**    Dft Anderson's letter admitting *numerous* conversations with Dft Sexton regarding the foreclosing of her home, content of conversations that was intentionally concealed from Dysart.

**October 15, 2007**    Defendant Peoples, associating-in-fact with TPBE to foreclose on Dysart's home.

**October 15, 2007**    Defendant Star Properties, associating-in-fact with TPBE fraudulently, knowingly and willfully entered into a sales agreement for Dysart's home.

72.   **18 U.S.C. § 1505 (Obstruction of Proceedings)**

Dates and Description of Violations:

**July 6, 2004**          Dft Cochran faxed a letter to Dysart's attorney, Dft Sexton with the attempt to collect $114,000.00 from Dysart while the Automatic Stay was in effect.

**July 19, 2004**          Dft Cochran faxed another letter to Dysart's attorney, Dft Sexton attempting to collect $114,000.00, this time *including a threat* that she did not pay, her house would be foreclosed on. The Automatic Stay was in effect.

73.   **18 U.S.C. § 1509 (Obstruction of Court Orders)**

Dates and Description of Violations:

**October 15, 2007**          Defendants associated-in-fact with TPBE by foreclosing on Dysart's home without adhering to the conditions of the September 4, 2007 Court Order.

**October 15, 2007**          Defendant Weidner violated her own Trial Brief draft that states "AN ACCOUNTING IS NECESSARY" so that Dysart would know how much her taxes would be. On **September 4, 2007** the Court ordered such an accounting. However, Defendant Weidner did not and could not give Dysart an accounting because she associated-in-fact with TPBE and unlawfully foreclosed on Dysart's home before the conditions of the Order were finalized.

## CONTINUITY

74.   As set forth in paragraphs 68 to 73 Defendants acts are not isolated incidents, but are consistent with an ongoing pattern of racketeering activity. Defendants' conduct is likely to

have continued as long as the Automatic Stay was in effect.  However, the common purpose of the enterprise was accomplished when Dysart's home was foreclosed on.

**DYSART'S INJURY**

75.    The actions of the Defendants has caused the Plaintiff to suffer economically and has caused her to suffer mental anguish, emotional distress, stress, physical discomfort and associated illnesses, as well.  As a result of Defendant's behavior, Plaintiff is now suffering from hypertension and is being medicated to control her blood pressure.  The level of stress that Plaintiff now suffers from has caused her to be treated for hyperthyroidism, and her eye pressures have become elevated, causing the need for medications to control Glaucoma. (See EXHIBITS 4, attached medical statements – Dr. Hall and Dr. Arguella, hereto and fully incorporated herein by reference).  Plaintiff believes all of these illnesses are related to the injuries she has received as a result of the Defendants control and participation in TPBE.  Not only that, but Plaintiff has been forced to live the last few years out of boxes, containers, and suitcases – all with her 94 year old mother "in tow".

## DISPLACEMENT FROM DYSART'S HOME CAUSED UNDUE PRESSURE AND RELATED DISCOMFORTS FOR HER

76.    The house at                    was not Dysart's first choice of residences. Dysart already had lot reservation on another piece of property. (See EXHIBIT 31, lot reservation – attached hereto and incorporated herein by reference).  However, her mother wanted to come back to Alabama and live with her. So Dysart chose that house because of the convenience to services that would be needed in order to give her elderly mother the best quality of life that she possibly could.  While living in the Vestavia home, Dysart's mother attended the

Hoover Senior Citizens Center on a daily basis and had a core group of friends that kept in touch, while not at the "center". Her mother was shocked, saddened, and depressed because she could no longer participate with other seniors that she was familiar with and had established friendships with.

77.     Dysart also chose that house because on the unfinished basement that could have been converted into an apartment in the event Dysart needed live-in assistance as her mother continued to advance in age. There was also the close proximity to Chateau Vestavia – which was directly across the street from her home, if skilled nursing care became the only option as her mother aged. The wrongful foreclosure on Dysart's home had a devastating effect on Dysart, her lifestyle, and on her mother.

## CAUSES OF ACTION

### COUNT ONE

### Violation of RICO, 18 U.S.C. § 1962(c)

78.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

79.     Each of the Defendants if a person under 18 U.S.C. § 1961(3).

80.     BankTrust a/k/a Peoples, Anderson & Associates LLC, Anderson & Weidner LLC, David B. Anderson, Deanna D. Weidner, Ryan K. Cochran, K. Edward Sexton, Star Properties LLC, Stephen G. Cummings III, are associated-in-fact in The Peoples BankTrust Enterprise ("TPBE"), and their association-in-fact constitutes an enterprise under 18 U.S.C. § 1961(4).

81.     In violation of 18 U.S.C. § 1962(c), Defendants managed, conducted, operated, and/or participated in the conduct of the affairs of TPBE, including, but not limited to, participation in such activities that furthered the Defendants' fraudulent scheme, through a pattern of racketeering activity involving multiple predicate acts of mail fraud, wire fraud, bank fraud, and all other predicate acts, as detailed within this Complaint.

82.     The common purpose of this close-ended pattern of racketeering activity had been to fraudulently divest Plaintiff of her primary residence.

83.     Since at least 2004 until 2007, Defendants knowingly and intentionally threatened, harassed, oppressed, suppressed information, and misled Plaintiff.  With reckless disregard for the truth, Defendants falsely misrepresented and advertised Plaintiff's home for sale, by way of newspaper and the Internet.  False advertisements were the Defendants' way of soliciting to the world for customers to purchase Dysart's home before and after the wrongful foreclosure.

84.     Defendants' use of the Alabama Messenger constitutes mail fraud under 18 U.S.C. § 1341.  As this legal news publication is generally mailed to subscribers. Defendant's use of the Birmingham News constitutes both mail fraud under 18 U.S.C. § 1341, as well as wire fraud under 18 U.S.C. § 1343.  The Birmingham News is available online, therefore; giving it not only a domestic but, a foreign effect on interstate commerce as well.

85.     As a direct and proximate result of Defendant's violation of 18 U.S.C. § 1962(c), Dysart was injured because she was forced out her home, a home where she was also primary caregiver for her elderly mother.  She was forced to accept a financial loss associated with the equity that she accumulated in her home.

86.     As a direct and proximate result of Defendant's violation of 18 U.S.C. § 1962(c), Dysart was injured physically.  The extreme mental anguish, and tremendous emotional distress that Dysart was under caused her illnesses of Graves disease/hyperthyroidism, and high blood pressure, that she attributes to the egregious conduct of the Defendants.

87.     As a direct and proximate result of Defendant's violation of 18 U.S.C. § 1962(c), Dysart is injured by the fact that she is now forced to take care of her mother on a 24/7 basis. While Dysart and her mother were in their home, Dysart's mother had daily activities and enjoyed a certain degree of independence.  Since Dysart's home was wrongfully foreclosed on, she and her mother have been forced to live in places unfamiliar her mother.  Because of her age, it is hard or impossible for her to adjust to such different places.  Therefore, she has become more dependent on Dysart to care for and interact with her.  This limits the opportunity for Dysart to work outside of the home.

88.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to treble her general and compensatory damages, plus interest, costs and attorneys' fees.

## COUNT TWO

### Violation of RICO, 18 U.S.C. § 1962(d)

89.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d), in order to conceal the truth from Dysart, as it related to the foreclosure of her mortgage.

91.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Dysart was injured because the Defendants withheld information that Dysart should have been made aware of.

92.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to treble her general and compensatory damages, plus interest, costs and attorneys' fees.

## COUNT THREE

### Breach of Contract, Violation of Code of Alabama 1975, § 6-5-280

93.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94.     Plaintiff and Defendant Peoples entered into a valid mortgage contract on August 30, 2002, which contained rights and obligations for both parties.

95.     Defendant breached that contract by not giving Plaintiff, Dysart notice of foreclosure as required by her mortgage document, the Fannie Mae/Freddie Mac UNIFORM MORTGAGE INSTRUMENT. Notice of her foreclosure was also required by Code of Alabama 1975, § 35-10-1 and Code of Alabama 1975, § 35-10-8.

96.     As a direct and proximate result of Defendant's breach of contract, Dysart was injured. Defendant's breach resulted in punitive, compensatory and consequential damages, that Dysart is entitled to recover for.

## COUNT FOUR

### Slander of Title, Violation of Code of Alabama 1975, § 35-4-153

97.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

98.     On October 15, 2007, Defendants wrongfully foreclosed on Dysart's home.  The sale was without notice to Dysart and in direct belittlement of Alabama common and statutory law.

99.     The foreclosure deed that was passed to Defendant Star Properties from Defendant Peoples is void and of no value, as it was passed under fraudulent pretenses. Defendant Peoples initiated a foreclosure proceeding against Dysart in violation of the law.

100.    As a direct and proximate result of Defendant's violation, Dysart was injured. Defendant's violation resulted in compensatory and consequential damages, that Dysart is entitled to recover for.

## COUNT FIVE

### Wrongful Foreclosure, Violation of Code of Alabama 1975, § 35-10-9

101.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

102.    Alabama Law states that any foreclosure sales made under powers contained in mortgages ... and are contrary to the provisions of this article, are null and void.  Power of sale was contained in Dysart's mortgage.  Defendants disregarded related Section 15, Notices; Section 19, Borrower's Right to Reinstate After Acceleration; and Section 22, Acceleration; Remedies, to Dysart's detriment.

103.   As a direct and proximate result of Defendant's violation, Dysart was injured. Defendant's violation resulted in compensatory and consequential damages, that Dysart is entitled to recover for.

## COUNT SIX

### Abuse of Process

104.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105.   On **September 4, 2007**, the Bankruptcy Court of the Northern District of Alabama lifted the Automatic Stay, giving Defendant Peoples the authority to foreclose the mortgage on her home.  Blacks' law dictionary defines "authority" as, The right or permission to act legally on another's behalf, ....  Defendants did not act legally.  Instead, Defendants acted illegally and egregiously.

106.   It was ordered that by **November 15, 2007**, the tax accounting – by the tax collector - regarding Dysart's property taxes be completed.

107.   By **November 15, 2007**, Dysart would have known the correct amount of taxes that she was to pay the Jefferson County Tax Collector.

108.   Defendants foreclosed on Dysart's residence on **October 15, 2007**.

109.   The tax accounting was not completed until November 28, 2007.

110.   On December 27, 2007, Defendants paid the taxes that Dysart should have paid. Dysart did not pay those taxes because the Defendants had fraudulently and wrongfully foreclosed on her residence two months before.

111.     As a direct and proximate result of Defendant's abuse of process, Dysart was injured.  Defendant's violation resulted in compensatory and consequential damages, that Dysart is entitled to recover for.

## COUNT SEVEN

### Violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

112.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

113.     The acts and omissions of Defendants constitute violations of the FDCPA.

114.     Defendants abused, threatened and harassed Plaintiff, Dysart.    Defendants collected a real property debt from Dysart when they were not legally entitled to do so.

115.     As a direct and proximate result of Defendant's FDCPA violations, Dysart was injured.  Defendant's violation resulted in compensatory and consequential damages, that Dysart is entitled to recover for.

## COUNT EIGHT

### Fraud, Suppression, and Deceit, Code of Alabama, 1975 §§§ 6-5-101,102,104

116.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

117.     Defendant Sexton, being under a fiduciary duty to disclose all facts to Dysart, failed to disclose, and actively suppressed material facts pertaining to Defendants' intent to illegally and improperly foreclose the mortgage on Dysart's residence.

118.    As a direct and proximate result of Defendant's violation and conduct, Dysart was injured.  Defendant's violation resulted in compensatory, consequential, and punitive damages that Dysart is entitled to recover for.

### REQUESTED RELIEF

119.    **WHEREFORE,** Plaintiff, Nell C. Dysart, prays this Honorable Court will grant judgment against Defendants as hereinafter set forth:

    a.    For general damages in an amount according to proof at trial;

    b.    For property damage and loss of use of property according to proof at trial;

    c.    For punitive damage and all treble damages based on compensatory damages per RICO statute as allowed by law according to proof;

    d.    For prejudgment interest as allowed by law;

    e.    For all compensatory damages;

    f.    For consequential damages;

    g.    For discretionary damages;

    h.    For all costs of suit, including attorney fees, investigators and other related legal fees;

    i.    For all special damages according to proof;

j.    Granting such other and further relief as the Court deems just and proper.

## CONCLUSION

To this Honorable Court,

Plaintiff Dysart began her search for legal representation to no avail, on or around October 15, 2007. It is not her intent to burden the Court with inexperience. She was however, left with no other choice in this matter, but to rely on the "very little" legal training that she has. Therefore, she begs this Court's forgiveness for any and all errors.

Plaintiff Nell C. Dysart's Complaint under the *RICO Act* is filed after much careful thought was given. Plaintiff Dysart files this Complaint herself on her behalf out of necessity that her cries for help will be heard and acted upon by the justice system. Dysart realizes that this Complaint contains deficiencies for her ignorance of the law. But she appeals to this Court that she might have an opportunity to supplement and/or correct any errors and omissions that are contained therein.

Respectfully submitted,

Dated: December 17, 2010

Nell C. Dysart, Pro Se Plaintiff
2509 Tempest Drive SW
Birmingham, AL 35211
P.O. Box 10042
Birmingham, AL 35202
(205) 369-4074 CL
(866) 388-8949 FX
ncdysart@msn.com

## VERICATION OF COMPLAINT

I, Nell C. Dysart, hereby take oath and state that:

1.      I have personal knowledge of the facts and circumstances underlying this suit and I have carefully read each of the allegations contained in the Complaint; and

2.      Each of the allegations contained in this Complaint are true and accurate to the best of my knowledge and belief.

Signed under the pains and penalties of perjury this 17th day of December, 2010.

Nell C. Dysart

STATE OF ALABAMA        )
COUNTY OF JEFFERSON  )

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Nell C. Dysart, whose name is signed to the foregoing instrument, and who is known to me, took oath and stated that the foregoing statements were true and accurate to the best of the affiant's knowledge and belief.

Given under my hand and seal of office this 17th day of December, 2010.

Norma H Walk

Notary Public

Norma H. Walk
My Commission Expires
02-18-2014

My commission expires:_____

41

**SERVE DEFENDANTS VIA CERTIFIED MAIL AT THE FOLLOWING ADDRESSES:**

BankTrust
Corporate Headquarters
100 St. Joseph Street
Mobile, AL   36602

W. Bibb Lamar, Jr.
c/o BankTrust
100 St. Joseph Street
Mobile, AL   36602

Edward T. Livingston
c/o BankTrust
310 Broad Street
Selma, AL   36701

Mac Martin
c/o BankTrust
310 Broad Street
Selma, AL 36701

Elaine Dellinger
c/o BankTrust
310 Broad Street
Selma, AL 36701

Elam P. Holley, Jr.
c/o Southcity Bank
1360 Montgomery Highway Ste: 100
Vestavia Hills, AL   35216

Anderson & Associates, LLC,
AKA Anderson & Weidner, LLC
Financial Center
505 20th Street North Ste:  1450
Birmingham, AL 35203

David B. Anderson

c/o Anderson & Associates, LLC,
AKA Anderson & Weidner, LLC
Financial Center
505 20th Street North Ste:  1450
Birmingham, AL 35203

Deanna L. Weidner
c/o David B. Anderson & Associates, LLC,
AKA Anderson & Weidner, LLC
Financial Center
505 20th Street North Ste:  1450
Birmingham, AL 35203

Ryan K. Cochran
c/o Waller, Lansden, Dortch & Davis, LLP
511 Union Street Ste: 2100
Nashville, TN 37219

K. Edward Sexton, II
c/o Gentle, Turner & Sexton
2  20th Street North Ste: 1200
Birmingham, AL 35203

Star Properties LLC
2120 16th Avenue South  Ste: 300
Birmingham, Alabama 35205

Stephen Cummings III
c/o Star Properties LLC
2120 16th Avenue South  Ste: 300
Birmingham, Alabama 35205

**Exhibits 1 thru 31 attached thereto and fully incorporated therein.**